# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOY GALLAGHER,<br>        Plaintiff,<br><br>        v.<br><br>TOWN OF FAIRFIELD, FAIRFIELD<br>BOARD OF EDUCATION, ANN CLARK,<br>DEBORAH JACKSON, JOHN BOYLE,<br>THOMAS CULLEN, and SALVATORE<br>MORABITO,<br>        Defendants. | | No. 3:10-cv-01270 (JAM) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joy Gallagher worked as an art teacher for Fairfield Public Schools for about 25

years until health issues—worsening respiratory and immune system problems and a diagnosis of

multiple myeloma—led to a series of medical leaves and ultimately prevented her from returning

to work in 2010. During the last few years of plaintiff's employment, plaintiff and the school

district negotiated and implemented several accommodations for her disability, but sadly her

condition worsened. After plaintiff completed the entire 2009–2010 school year on medical

leave, she learned that she had been diagnosed with multiple myeloma, and her doctor ordered

that she refrain from returning to work for the foreseeable future. Eventually, the school district

terminated her employment.

Plaintiff believes that environmental conditions in the school building caused or

exacerbated her health issues and that the school should have done more to accommodate her

disability. She sues the Town of Fairfield, the Fairfield Board of Education, and a number of

school and school district officials for their role in her suffering and loss of employment. All

1

defendants have moved for summary judgment on the claims against them, and for the reasons below I will grant their motion.

### BACKGROUND

Plaintiff Joy Gallagher was hired by Fairfield Public Schools in 1984 as an art teacher at Jennings School. She later took the same position at North Stratfield Elementary School, beginning with the 1994–1995 school year. In the summer of 2007, in order to accommodate increasing enrollment, the North Stratfield administration decided to convert the school's art room into two classrooms by erecting a new wall, reducing the size of the art room. Other options for accommodating increased enrollment were considered, including a portable classroom, conversion of other classrooms, and modifications to the faculty room.

Prior to the start of the 2007–2008 school year, plaintiff had never requested any special accommodations on the basis of a disability. However, as an exception to the usual policy of prohibiting teachers from bringing in their own appliances, plaintiff was allowed two personal air cleaners and a personal refrigerator in the art room, due to her severe allergies. At the time the school administration decided to modify the art room, plaintiff had no impairment that required any other accommodation. Plaintiff began the school year in the modified art room, which no longer had an operable window.

Unfortunately, within the first day or two of that school year, plaintiff felt ill. She informed the school principal—Deborah Jackson—that there were odors associated with paints, sealants, and adhesives in the now-windowless art room. Jackson informed Tom Cullen and Dave Fryer—the director of operations and the manager of facilities, respectively. They verified that the building's exhaust system and the exhaust system in plaintiff's art room were functioning properly.

Dr. James Ralabate wrote to the school on plaintiff's behalf in mid-September 2007, explaining that plaintiff was being followed for bronchitis, asthma, and allergic rhinitis that he believed "may be due to environmental or air quality control issues," and asking for assistance "in improving the air quality conditions in her work environment." Doc. #82-8 at 2. As a result, plaintiff taught "art on a cart" for two or three weeks, rather than teaching in her classroom. Doc. #82-37 ¶ 25–26; Doc. #87 ¶ 25–26.

Five weeks into the school year, the school board installed an air conditioning unit and an operable window in the art room, but like the exhaust system in the room, the new air conditioner did not bring fresh air inside. Therefore, the school board consulted with the fire marshal and reconfigured the art room door to provide the room with air from the hallway.

Meanwhile, in late September 2007, plaintiff reported to Jackson that there was a stain on a ceiling tile directly below the skylight in the art room. In accordance with the school district's policy, the ceiling tile was replaced within 48 hours of the report in order to avoid mold growth. In early October, plaintiff reported another ceiling stain. This time, maintenance personnel determined that there was a leak in the ceiling as a result of a fractured skylight, and a tarp was placed over the skylight in mid-October as a temporary measure while awaiting repairs.

Around the same time, another one of plaintiff's doctors—Dr. William Rockwell—wrote to the school, noting that the exhaust fan, operable window, and air conditioner represented "a positive change in improving the indoor air quality of her room and should be continued." Doc. #82-11 at 2. He recommended that an HEPA air cleaner, preferably electronic, be installed as well.

In late October 2007, plaintiff requested and was granted a medical leave of absence. She

did not return until early January 2008. The school provided a new air cleaner to plaintiff's classroom on her first day back.

Before her return, plaintiff had written to Jackson to request a repair of the skylight. Jackson consulted with maintenance and informed plaintiff that the work would not be completed by plaintiff's first day back. Plaintiff returned on the planned day nonetheless, and during the repair process some particles fell into the art room while she was present. Jackson immediately went to the art room and instructed plaintiff to leave work early. Plaintiff's health suffered yet again, and she did not return to work for more than two weeks, by which time the skylight repair work was completed.

Plaintiff requested another medical leave of absence a few weeks later in February 2008. She furnished a letter from Dr. John Santilli, who determined that her work environment was exacerbating her already-serious allergy issues and recommended that she leave work for the remainder of the school year. *See* Doc. #82-13 at 2–3; Doc. #86-3 at 2–3. The letter noted:

> It is my understanding that the ventilation conditions in the offending room have been corrected since the onset of Joy's health issues. My patient's reactions to the school environment and art materials have not been completely restored to the status of her health in August 2007, prior to her exposure. This room, given the opportunity to stabilize with electronic air cleaning and air conditioning, will provide the best starting environment when Mrs. Gallagher does return to duty.

Doc. #82-13 at 3; Doc. #86-3 at 3. The school board granted the medical leave request, and plaintiff did not teach from March 1 through the remainder of the 2007–2008 school year.

Before the new school year began, in summer 2008, plaintiff, Dr. Santilli, and human resources administrator Mary Fitzgerald met to discuss potential accommodations for the upcoming year. Plaintiff was offered a transfer from North Stratfield Elementary School to Riverfield Elementary School, which had a larger art room and numerous operating windows. Although Dr. Santilli had previously told plaintiff that she needed to transfer schools, at this

4

point he recommended that she remain at North Stratfield because she had "demonstrated a tolerance" for the school and because the accommodations of air conditioning, an electronic air purifier, an operable window, and a way to keep the door open provided a "much more acceptable air quality." *See* Doc. #82-15 at 5. At the time, he had never inspected the air quality of either the North Stratfield or the Riverfield art rooms. Plaintiff viewed the transfer as punitive and did not want to adjust to a new school. Neither she nor Dr. Santilli recommended any alternative accommodations at that time.

Plaintiff decided to remain at North Stratfield and taught in the art room for the 2008–2009 year without incident. In April 2009, plaintiff learned by happenstance that the electronic air cleaner that had been installed in her classroom in January 2008 had previously been purchased for McKinley School, which was torn down due to mold.[1] The record does not indicate whether the cleaner was actually used at McKinley, and there is no evidence that it was ever contaminated with mold. According to Cullen and Fryer, the unit was inspected and cleaned prior to being placed in plaintiff's classroom and also cleaned during its time in the classroom. Doc. #82-29 ¶ 14; Pl.'s Exh. 16 (Fryer Dep.) at 26. Dr. Santilli wrote to the school district's superintendent—Ann Clark—and, based on the information he had received from plaintiff and her husband, requested that the air cleaner be replaced due to mold contamination from its use at McKinley. The school board consulted with an industrial hygienist and provided plaintiff with a brand new Kenmore HEPA air cleaner.[2]

In July 2009, plaintiff wrote to Clark, requesting that the wall in the art room be

---

[1] According to plaintiff, her husband phoned the air cleaner's manufacturer to ask about the appropriate cleaning protocol because the unit appeared filthy, and the company's president informed him that the cleaner had initially been delivered to McKinley School.

[2] The parties disagree about whether Dr. Santilli approved of this new air cleaner. *Compare* Doc. #82-29 (Cullen Aff.) ¶ 15 (according to Cullen, Dr. Santilli appoved), *with* Doc. #86-2 at 11 (Pl.'s Aff.) ¶ 13 (according to plaintiff, Dr. Santilli did not approve).

demolished and that the room be reconfigured. *See* Doc. #82-17 at 2–5. She believed that a reconfiguration would allow her to remain teaching because there would be a bank of windows and another hallway door—improvements that also would have been available in the art room she turned down at Riverfield. Plaintiff never fully discussed this accommodation with Dr. Santilli, and he never himself proposed it to the school district. The school board denied plaintiff's request, and (as of the time of the motion for summary judgment filing), the modified art room was still being used for art classes.

Plaintiff took another medical leave of absence, this time for the entire 2009–2010 school year. During that time, the school board paid the salary of another art teacher to replace plaintiff in the classroom and additionally paid plaintiff the difference between her salary and the amount she received from workers' compensation.

In July 2010, Dr. David Witt wrote a letter explaining that plaintiff had been diagnosed with multiple myeloma in February 2010, that it would be "reasonable to conclude that the onset of this cancer is related to her working environment," and that she "should refrain from returning to work in any capacity for the foreseeable future to afford her the opportunity to stabilize and protect her from viral and/or bacterial infections to which she is highly susceptible." Doc. #82-18 at 2. Over the next two months, plaintiff provided the school board no indication as to when, if ever, she would return to teaching, and the board continued to pay her salary (with reimbursement for the portion covered by workers' compensation).

In October 2010, the school board placed plaintiff on "inactive" status and removed her from the payroll. Doc. #82-28 (Fitzgerald Aff.) ¶ 15. Plaintiff's status was changed to "retired" in early 2012 when the school district learned that she had been receiving disability benefits from the State Teachers' Retirement Board as of early 2011. Doc. #82-25 at 2. No doctor has

6

authorized plaintiff to return to work at any time since before the 2009–2010 school year, and plaintiff has made no request for accommodations to do so since her 2009 request to remove the wall was denied.

Meanwhile in August 2010 (just after informing the school district of her multiple myeloma diagnosis and two months before she was removed from the payroll), plaintiff initiated the instant lawsuit against the Town of Fairfield, Fairfield Board of Education, Ann Clark (superintendent of Fairfield Public Schools), Deborah Jackson (principal of North Stratfield Elementary School), John Boyle (deputy superintendent of Fairfield Public Schools), Thomas Cullen (director of operations), and Salvatore Morabito (director of safety, security, and construction).

After several rounds of amendments and partial dismissals, plaintiff filed the operative amended complaint in May 2013 in accordance with the Court's prior rulings. That complaint alleges that the termination of plaintiff's wages and benefits in October 2010 was an act of discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), the Connecticut Fair Employment Practices Act ("CFEPA"), and the Rehabilitation Act; that defendants had additionally violated the Rehabilitation Act by failing to provide reasonable accommodations for plaintiff's disability; and that defendants' actions amounted to the intentional infliction of emotional distress. *See* Doc. #74; Doc. #86 at 2.[3] Defendants have now moved for summary judgment on all claims. Doc. #82.

### DISCUSSION

The principles governing a motion for summary judgment are well established. Summary

---

[3] Plaintiff's briefing clarifies that the Town is no longer a defendant in this case for the purpose of any of the claims, that the ADA, CFEPA, and Rehabilitation Act claims are against only the Fairfield Board of Education, and that the intentional-infliction-of-emotional-distress claim is against only the individual defendants. *See* Doc. #86 at 2, 14 n.3, 33.

judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Discrimination under the ADA, CFEPA, and the Rehabilitation Act*

Plaintiff alleges that the termination of her wages and benefits in October 2010 amounted to discrimination in violation of the ADA (Count One), the Rehabilitation Act (Count Three), and CFEPA (Count Five). Both the ADA and CFEPA prohibit discrimination on the basis of disability and apply the same legal framework to the discrimination analysis. *See Stoffan v. S. New Eng. Tel. Co.*, 4 F. Supp. 3d 364, 372 n.2 (D. Conn. 2014). These claims of disability discrimination are subject to the familiar *McDonnell Douglas* burden-shifting standard. *See McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013). A plaintiff may establish a *prima facie* case for discrimination if she can show by a preponderance of the evidence that:

> (1) [her] employer is subject to the ADA[/CFEPA]; (2) [s]he was disabled within the meaning of the ADA[/CFEPA]; (3) [s]he was otherwise qualified to perform

the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability.

*Ibid.* (internal quotation marks and citation omitted). If the plaintiff succeeds in meeting that burden, her employer can counter the presumption of discrimination by proffering a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Finally, the plaintiff can still succeed in her claim if she can show that the proffered reason was a "pretext" for discrimination, *id.* at 804, a showing which requires her to demonstrate both that her employer's stated reason was untrue or incomplete and that discrimination played a causal role in her termination. *See Henry v. Wyeth Pharm., Inc*., 616 F.3d 134, 157 (2d Cir. 2010); *Kerzer v. Kingly Mfg*., 156 F.3d 396, 401 (2d Cir. 1998) ("An employer's reason for termination cannot be proved to be a pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993))); *see also Stoffan*, 4 F. Supp. 3d at 372.

Although "[c]ourts generally apply the same legal standards when adjudicating claims arising under the ADA and ones arising under the Rehabilitation Act," *Lute v. Dominion Nuclear Conn., Inc.*, 2015 WL 1456769, at *7 n.5 (D. Conn. 2015) (alteration in original) (internal quotation marks and citation omitted), the requirements are slightly different for Rehabilitation Act claims. In order to establish a *prima facie* case for discrimination under the Rehabilitation Act, a plaintiff must establish that: (1) her employer receives federal funding; (2) she is a "handicapped person" under the Act; (3) she is "otherwise qualified" for her position; and (4) she was excluded "solely" because of her handicap. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (internal quotation marks and citation omitted).[4]

---

[4] The operative complaint includes as part of Count Three "Rehabilitation Act discrimination" and alleges that defendants violated the Rehabilitation Act in part "when they treated plaintiff differently than similarly situated non-disabled employees . . . and terminated her wages and benefits." Doc. #74 at 10. But plaintiff's briefing in

Plaintiff's disability discrimination claim fails the requirement of all three of the statutes upon which she relies that she have been qualified or able to perform the essential functions of her job, with or without reasonable accommodations, at the time that the school district terminated her salary and benefits in October 2010.[5] Plaintiff's own physician—Dr. Witt—made it very clear in his July 2010 letter that plaintiff was not able to return to work "in any capacity for the foreseeable future[.]" Doc. #82-18 at 2. In fact, no doctor has authorized plaintiff to return to work at any time since before the 2009–2010 school year. They have made plaintiff "well aware" that using art materials (an undisputed necessity for her job as an art teacher) "could trigger progression of [her] multiple myeloma," Doc. #82-34 (Pl.'s Dep.) at 10.

Plaintiff misplaces her reliance on certain Second Circuit cases. *See Parker v. Columbia Pictures Indus.*, 204 F. 3d 326, 338 (2d Cir. 2000) ("Terminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA."); *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995) ("Failure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."). Unlike what those cases describe, this case is not one in which plaintiff was terminated for being unable to perform a job that she could in fact perform with the right accommodations; at the time that she stopped receiving her salary, it is undisputed that plaintiff could not work as an art teacher, period. Plaintiff's brief even concedes as much, arguing at one

---

connection with summary judgment states that the remaining Rehabilitation Act claims include only failure to accommodate and retaliation (Doc. #86 at 2), such that it appears that plaintiff has abandoned her claim of discrimination under the Rehabilitation Act.

[5] The Court has previously ruled that the only adverse employment action that may be challenged in this case under the ADA and CFEPA is the termination of wages and benefits in 2010, although the Court may consider as background evidence the history of plaintiff's troubles at North Stratfield Elementary School. Doc. #73 at 5–8.

point that plaintiff "remained qualified at least through February[ ] 2010," Doc. #86 at 16, at another that a reasonable jury could find her qualified "at least through July[ ] 2009," *id.* at 18, and nowhere that plaintiff was able to work with any accommodations in the fall of 2010.

As Judge Arterton has noted, "[i]t is axiomatic that an individual cannot perform the essential functions of a job if she is completely unable to work regardless of accommodation." *Chasse v. Computer Sci. Corp.*, 453 F. Supp. 2d 503, 518 (D. Conn. 2006) (internal quotation marks and citation omitted). Here, as in *Chasse*, "[b]ecause plaintiff's own doctor . . . was unwilling to give her clearance to return to work, even with accommodation . . . by the end of her . . . medical leave period, the undisputed facts demonstrate that plaintiff was not qualified to perform her job by the end of her medical leave." *Ibid.*[6]

Even if plaintiff could show that she was able to perform her job at the time that she was terminated, no genuine issue of fact remains to show that she was terminated because of her disability (as distinct from her conceded inability to do her job). Plaintiff has not provided enough evidence to raise a triable issue that her employer's legitimate, nondiscriminatory reason for her termination—that it no longer made sense to continue keeping plaintiff on the payroll when she could not perform the essential function of her job and when there was no suggestion of when, if ever, she would be able to return to work—was an untrue or incomplete explanation, and that in fact plaintiff's wages and benefits were terminated as a result of disability-based animus or discrimination. *See Henry*, 616 F.3d at 157; *Kerzer*, 156 F.3d at 401.[7]

---

[6] To the extent that plaintiff's discrimination claim is based on the school district's failure to give her a reasonable accommodation that in turn led to her inability at a later time to do her job, *see McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (noting that "[u]nder both [the ADA and the Rehabilitation Act], a defendant discriminates when it fails to make a reasonable accommodation"), plaintiff's reasonable accommodation claim is discussed later in this ruling.

[7] There is some dispute among courts within the Second Circuit as to what standard of causation applies to ADA discrimination claims. *See, e.g.*, *DeAngelo v. Yellowbook Inc.*, 2015 WL 1915641, at *7 (D. Conn. 2015) (listing cases). Under either the "motivating factor" or "but-for" causation standard, plaintiff has not provided evidence from which a reasonable jury could conclude that disability discrimination caused her termination.

Plaintiff argues that the ineffectual accommodations she received from 2007 onward should be considered evidence that discriminatory animus, rather than legitimate reasons, motivated her termination. But even taking the facts in the light most favorable to her, no reasonable jury could conclude that those multiple accommodations—the operable window, air conditioner, hallway door mechanism, air cleaner, new air cleaner, medical leaves, and more— were provided in bad faith with the purpose of terminating her employment.

Plaintiff claims that a jury could infer animus from the school board's failure to apply her accrued sick leave prior to her termination. But at the time of her termination, the school board had already been voluntarily paying the difference between her salary and her workers' compensation for over a year, and had continued to do so for an additional two months after being told that she could not work for the foreseeable future and that she was suing for discrimination. Given this context, no reasonable jury could find disability-based discriminatory animus or intent.

In short, no genuine issue of material fact remains from which a reasonable jury could conclude that plaintiff was discriminated against on the basis of disability in violation of the ADA, CFEPA, or the Rehabilitation Act when her wages and benefits were terminated in October 2010. Plaintiff's real complaint is akin to a workers' compensation claim that her working conditions caused or exacerbated her disability; this type of claim does not suffice to establish unlawful discrimination (apart from whether the school district—as discussed later in this ruling—failed to afford plaintiff a reasonable accommodation that would have prevented her from becoming unable to perform her job). Accordingly, summary judgment will be granted as to the ADA, CFEPA, and Rehabilitation Act disability discrimination claims as alleged in Counts One, Three, and Five of the complaint.

***Retaliation under the ADA, CFEPA and the Rehabilitation Act***

Plaintiff also alleges that the termination of her wages and benefits in October 2010 was an act of retaliation in violation of the ADA (Count Two), Rehabilitation Act (Count Four), and CFEPA (Count Six). Those three statutes prohibit not only discrimination on the basis of disability, but also retaliation for engaging in protected activity. Claims for unlawful retaliation under are analyzed under the same *McDonnell Douglas* burden-shifting framework as claims of discrimination. *See Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014) (*per curiam*); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). In order to set forth a *prima facie* case of retaliation, plaintiff must establish that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks and citations omitted).[8] If plaintiff can make such a showing, her employer may counter the presumption of retaliation by proffering a legitimate, nonretaliatory reason for its action, and she in turn can overcome its proffer with evidence of pretext. *See Marini v. Costco Wholesale Corp.*, -- F. Supp. 3d --, 2014 WL 6772287, at *11 (D. Conn. 2014), *reconsideration denied*, 2015 WL 1169284 (D. Conn. 2015).

There is no dispute that plaintiff engaged in protected activity when she requested accommodations for her disability,[9] that her employer knew of that activity, and that it took an adverse action against her when it terminated her wages and benefits in 2010. But no reasonable

---

[8] This standard applies to retaliation claims under the Rehabilitation Act and the ADA, *Weixel*, 287 F.3d at 148, as well as to retaliation claims under CFEPA, *Marini v. Costco Wholesale Corp.*, -- F.Supp.3d --, 2014 WL 6772287, at *11 (D. Conn. 2014), *reconsideration denied*, 2015 WL 1169284 (D. Conn. 2015).

[9] Plaintiff's brief clarifies that the protected activity she believes triggered retaliation is her requests for accommodations, rather than the filing of the instant lawsuit. Doc. #86 at 28.

jury could find a causal connection between plaintiff's requests for accommodations—the last of

which took place in July 2009—and her termination nearly 15 months later in October 2010.[10]

Causality may be shown directly (such as through "evidence of retaliatory animus

directed against the plaintiff by the defendant") or indirectly (such as "by showing that the

protected activity was followed closely by discriminatory treatment, or through other

circumstantial evidence"). *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Plaintiff provides neither direct nor indirect evidence. For direct evidence, she does not cite any

evidence of hostile or derisive comments targeting her disability. For indirect evidence, it is

undisputed that 15 months elapsed between plaintiff's last accommodation request and the

termination of her employment; this lengthy gap of time significantly undercuts any inference of

a causal connection, and even a close temporal relationship would not by itself suffice to

establish retaliatory motive. *See, e.g.*, *Abrams v. Dep't. of Pub. Safety*, 764 F.3d 244, 254–55 (2d

Cir. 2014).

Moreover, the undisputed evidence shows sustained efforts by defendants to respond to

her complaints about the air conditions in her art room. In response to plaintiff's requests for

accommodations, the school board provided her an air conditioner, an air cleaner (and another

new air cleaner when plaintiff and Dr. Santilli expressed concerns about the initial air cleaner), a

way to rig up the hallway door for fresh air, an offer to transfer to a school whose art room

provided greater access to fresh air, and every medical leave of absence she requested. Even

when the board denied her last request for accommodation in July 2009 by declining to tear

---

[10] Although the causation standard for retaliation claims under the ADA, CFEPA, and the Rehabilitation Act (as in disability discrimination claims under those statutes) has not been definitively resolved, substantial authority suggests that a plaintiff alleging retaliation must establish that retaliation was a "but-for" cause of the adverse action and not simply a "substantial" or "motivating" factor. *See Lute*, 2015 WL 1456769, at *12 (applying "but-for" causation standard in ADA and Rehabilitation Act retaliation context); *Marini*, 2014 WL 6772287, at *11 (applying "but-for" causation standard in ADA and CFEPA retaliation context) (citing *Zann Kwan*, 737 F.3d at 843). I find that plaintiff has failed to establish a genuine issue of fact of a causal connection between her requests for accommodation and her termination under either the "motivating factor" or "but-for" causation standard.

down the wall in the North Stratfield art room, it nevertheless ensured that plaintiff received her full salary and benefits for the next year of medical leave. And even after learning of plaintiff's multiple myeloma diagnosis, inability to work in any capacity for the foreseeable future, and intent to file suit, the school board continued to keep plaintiff on the payroll for an additional two months, despite receiving no indication of whether and when she might ever return to work. Taking the facts in the light most favorable to plaintiff, no reasonable jury could find that plaintiff's termination was in retaliation for plaintiff's complaints or requests for accommodation. Accordingly, I will grant defendants' motion for summary judgment as to the retaliation claims alleged in Counts Two, Four, and Six.

### *Failure to Accommodate under the Rehabilitation Act*

Count Three of the complaint alleges a claim under the Rehabilitation Act of failure to accommodate plaintiff's disability. The Rehabilitation Act requires an employer to provide reasonable accommodations for qualified employees with a disability. Claims for failure to do so are also subject to a burden-shifting framework, slightly different from the *McDonnell Douglas* framework used above. A *prima facie* case of failure to accommodate requires a plaintiff to demonstrate:

> (1) that [the d]efendant is subject to the Rehabilitation Act; (2) that [s]he is an individual with a disability within the meaning of the Rehabilitation Act; (3) that, with or without reasonable accommodation, [s]he could perform the essential functions of [her] job; and (4) [the d]efendant had notice of [her] disability and failed to provide such accommodation.

*Nandori v. City of Bridgeport*, 2014 WL 186430, at *5 (D. Conn. 2014) (citing *Lyons v. Legal Aid. Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995)).

A reasonable accommodation is, quite simply, one that enables an employee to perform the essential functions of his or her position, and "employers are not required to provide a perfect

15

accommodation or the very accommodation most strongly preferred by the employee." *Noll v. Int'l Bus. Machines Corp.*, -- F.3d --, 2015 WL 2402518, at *3 (2d Cir. 2015); *see also Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384–85 (2d Cir. 1996).[11] Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," it is equally true that "in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll*, 2015 WL 2402518, at *3 (quoting *Wernick*, 91 F.3d at 385).

In this case, plaintiff points vaguely to several ways in which she believes the school board failed to reasonably accommodate her disability. She states that "defendant provided some simple accommodations, but was not engaged in solving problems that arose with those accommodations with an eye toward getting plaintiff back to work permanently." Doc. #86 at 26. She argues that "there is evidence from which a jury could find that defendant did not engage in the interactive process in good faith, became frustrated with plaintiff and her doctors, were dismissive of her health problems, and did not take her concerns seriously, did not follow their own procedures for dealing with people with disabilities to the extent they even existed, and did not provide effective accommodations." *Id.* at 27. In terms of the specific accommodations she believes she was entitled to and denied, she mentions "cleaning and maintenance of appropriate air cleaners, . . . modification of art room [sic] back to its original configuration[,]" and "[holding] her position open longer or at least to the extent of her sick leave." *Ibid.* I will address each of these specific contentions in turn.

*Cleaning and Maintenance of Appropriate Air Cleaners*

---

[11] Although *Noll* and *Wernick* both involved ADA claims, the Second Circuit has elsewhere concluded that the "reasonable accommodation" standard is the same for purposes of both the ADA and the Rehabilitation Act. *See Lyons*, 68 F.3d at 1515.

Plaintiff's first request for an air cleaner as an accommodation came via Dr. Rockwell's letter on October 18, 2007. Doc. #82-11 at 2. On October 30, 2007 (eight weekdays later), Dr. Santilli wrote to the school to request that plaintiff be granted a medical leave of absence, which was granted. *See* Doc. #82-10 at 2. Plaintiff then remained out of school until early January 2008, at which point an air cleaner was provided on her first day back at work. Over a year later, in April 2009, plaintiff complained that the air cleaner was dirty and that she believed it had been contaminated by use at the McKinley School. But the record contains no evidence of protocols for maintenance that the school board failed to follow and no evidence that the air cleaner was or had ever been contaminated with mold as she feared. On the contrary, Cullen and Fryer have testified that the cleaner "was inspected and cleaned in accordance with the manufacturer's requirements." Doc. #82-29 (Cullen Aff.) ¶ 14; *see also* Pl.'s Exh. 16 (Fryer Dep.) at 26. Plaintiff's own evidence includes a note stating that:

> All units were thoroughly cleaned prior to being removed from McKinley and being placed in storage. I believe a protocol was provided for the cleaning by an environmental consultant at that time. It included wiping with bleach solution.
> . . . .
> Prior to installing at North Stratfield, the unit was taken from the storage area of the Rec Department and brought to the maintenance building where it was once again thoroughly cleaned, filters removed, washed, dried and wiped down with disinfectant and reassembled. . . .
> In August 2008, the unit was again cleaned thoroughly by the head custodian. . . .
> . . . .
> Each unit from McKinley has an indicator light which illuminates when the filter is in need of cleaning. At no time did this light come on.

Doc. #86-3 at 13.[12]

Furthermore, upon plaintiff's concerns and those of Dr. Santilli (based, it seems, primarily on the air cleaner's association with McKinley School), the school board conferred with a certified industrial hygienist to purchase a brand new HEPA air cleaner for plaintiff. *See*

---

[12] The author of this note is left unidentified in plaintiff's exhibit.

Doc. #82-29 (Cullen Aff.) ¶ 15. Plaintiff has not provided sufficient evidence from which a reasonable jury could conclude that defendant failed to provide reasonable accommodations with regard to its provision or maintenance of air cleaners.

*Modifying the Art Room by Removing the Wall*

In July 2009, plaintiff requested that the wall erected in the art room in 2007 be torn down, and the school board denied her request. But whether or not this request was reasonable, she has not provided sufficient evidence for a reasonable jury to find that doing so would have allowed her to continue working at that time, as needed to meet the third prong of her *prima facie* case. Indeed, she concedes that she never fully discussed this accommodation with her doctor, and he never himself proposed it to the school board. *See* Doc. #82-37 ¶ 84; Doc. #87 ¶ 84. Plaintiff bears the burden to establish "both that [her] requested accommodation would enable [her] to perform the essential functions of [her] job and that it 'would allow [her] to do so at or around the time at which it is sought.'" *Nandori*, 2014 WL 186430, at *5 (quoting *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009)). The record states only that plaintiff requested this accommodation in July 2009 without a doctor's input into the process, was denied, and then applied for and received a full year of medical leave—leaving a reasonable jury no evidence from which to infer that granting her request would have helped her avoid the need for that leave of absence. Without more, plaintiff has not provided sufficient evidence at the *prima facie* stage.

Meanwhile, a year prior, the school board had offered plaintiff a transfer to Riverfield Elementary School, which had an art room that was larger than North Stratfield's and that had numerous operating windows and another hallway door—the same qualities plaintiff believed the North Stratfield art room would regain if the wall were demolished. *See* Doc. #82-37 ¶¶ 66–

18

67, 85; Doc. #87 ¶¶ 66–67, 85. In short, no genuine fact issue shows that the school district did

not offer a reasonable accommodation, much less that its failure to offer a reasonable

accommodation at any time was the cause of plaintiff's inability to continue teaching.[13]

*Holding Position Open Longer*

Plaintiff believes the school district should have held her position open for longer or at

least for the duration of her accrued sick leave. She cites no law to support her position that after

multiple extended medical leaves of absence (the last of which was a full year long) and a

doctor's letter notifying the school board that plaintiff would not be able to work in any capacity

for the foreseeable future, the board was nevertheless obligated by its duty to provide reasonable

accommodations to continue to keep her on the payroll for longer than the approximately two

months after it received the letter—during which time it received no suggestion that plaintiff

might ever be able to return to work. "'The duty to make reasonable accommodations does not . .

. require an employer to hold an injured employee's position open indefinitely while the

employee attempts to recover. . . .'" *Nandori*, 2014 WL 186430, at *5 (quoting *Parker*, 204 F.3d

at 338); *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) (the

law "does not require an employer to accommodate an employee who suffers a prolonged illness

by allowing him an indefinite leave of absence" (internal quotation marks and citation omitted)).

Plaintiff provides no evidence that a lengthier medical leave—whether the duration of her

accrued sick leave or otherwise—would have ever allowed her to perform the essential functions

of her job, and she therefore cannot set forth a *prima facie* showing that she was denied a

reasonable accommodation on this basis.

---

[13] Plaintiff misplaces her reliance on *Eckstrand v. Sch. Dist. of Somerset*, 583 F.3d 972 (7th Cir. 2009), in which the Seventh Circuit reversed summary judgment on the basis of a teacher plaintiff's evidence that, had she been accommodated in light of her disability with a transfer to a different classroom, she could have performed the essential functions of her job. *Id.* at 977. Here, the school district did offer plaintiff a different classroom, which she refused.

*Bad Faith in Interactive Process*

Plaintiff believes that the school board "was not engaged in solving problems" and "did not engage in the interactive process in good faith." Doc. #86 at 26–27. "An employee's request for accommodation of a disability triggers a duty on the part of the employer to investigate that request and determine its feasibility." *Zito v. Donahoe*, 915 F. Supp. 2d 440, 446 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). The parties are supposed to engage in an "'interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'" *Ibid.* (quoting *Jackan v. N.Y. State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir. 2000) (some internal quotation marks omitted)); *see also* 29 C.F.R. § 1630.2(o)(3)("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").

"Nevertheless, an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641–42 (2d Cir. 2012). And "[a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." *Zito*, 915 F. Supp. 2d at 446 (citing *Nugent v. St. Lukes–Roosevelt Hosp. Ctr.*, 303 F. App'x. 943, 946 (2d Cir. 2008)).

Here, no reasonable jury could find that the school board's efforts to accommodate plaintiff amounted to bad faith or even a breakdown in the interactive process. The school board worked with plaintiff consistently over the course of the 2007–2008 school year to provide accommodations requested by plaintiff: an air conditioner, a way to keep the hallway door open, an operable window, an air cleaner, and multiple lengthy medical leaves of absence. Before the

20

2008–2009 school year, the board set up a meeting with plaintiff and her doctor to discuss accommodations and offered a transfer to a school with an art room that had more of the qualities plaintiff sought in hers. In 2009, when plaintiff expressed concerns about the air cleaner that had been provided for her, the board conferred with a certified industrial hygienist and purchased a new air cleaner. That summer, the board denied her request to tear down the North Stratfield art room wall, but allowed plaintiff to take the entire 2009–2010 year on medical leave. Another year later, after plaintiff's doctor reported that she would be unable to teach for the foreseeable future, the school board still kept her on the payroll well into the fall of the 2010–2011 school year—perhaps on another medical leave, although the record does not explain the district's basis for continuing to pay a teacher who was not teaching at that time.

That plaintiff found those accommodations inadequate or undesirable, and that those accommodations did not ultimately solve her health issues, does not indicate a breakdown in communication or efforts to problem-solve. Furthermore, to the extent that the lack of communication during the summer and fall of 2010 could be construed by plaintiff as a breakdown in the interactive process after plaintiff was diagnosed with multiple myeloma, such breakdown cannot be attributed to the school board, when there is no evidence that plaintiff attempted to contact her employer at all to indicate if, when, and under what circumstances she might be able to return to work.

Finally, even if, as plaintiff argues, the school board should have done something more to fulfill its obligation to engage in an interactive process, plaintiff has not met her burden of showing that any reasonable accommodations existed at the time of her termination or that the board failed to provide her with reasonable accommodations at any point prior to then. *See McElwee*, 700 F.3d at 641–42. She therefore cannot prevail on her claim in Count Three under

the Rehabilitation Act for failure to provide reasonable accommodations or to engage in an

interactive process to provide reasonable accommodations.

### Intentional Infliction of Emotional Distress

Count Seven of the complaint alleges that the actions of the individual defendants

amounted to the intentional infliction of emotional distress.

> In order to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Gillians v. Vivanco-Small*, 128 Conn. App. 207, 211, 15 A.3d 1200 (2011) (internal quotation

marks and citation omitted). The standard for extreme and outrageous conduct is stringent:

"liability 'requires conduct exceeding all bounds usually tolerated by decent society, of a nature

which is especially calculated to cause, and does cause, mental distress of a very serious kind.'"

*Lawson v. Hilderbrand*, -- F. Supp. 3d --, 2015 WL 753708, at *14 (D. Conn. 2015)

(quoting, *inter alia*, *DeLaurentis v. City of New Haven*, 220 Conn. 225, 267, 597 A.2d 807

(1991)). Such conduct must be "'so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community.'" *Ibid.* (quoting, *inter alia*, *Appleton v. Bd. of Educ. of Town of

Stonington*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000)).

No genuine issue of fact suggests that any of the defendants intended to cause plaintiff

emotional distress, much less that they engaged in the type of outrageous conduct required to

sustain such an emotional distress claim. Plaintiff, for example, has provided no evidence from

which a jury could find that any of the individual defendants—or anyone in the school district,

for that matter—had malicious intent when the decision was made to place the McKinley-

associated air cleaner in plaintiff's classroom or when workers performed repairs to her skylight in January 2008 after plaintiff had returned from her medical leave of absence. There is no evidence that any of any of the individual defendants even selected the offending air cleaner or knew it had been selected for plaintiff, let alone that anyone did so with intent to injure plaintiff or create a dangerous situation (in a school classroom frequently occupied by children, no less). *See* Doc. #82-29 (Cullen Aff.) ¶ 12 (Cullen requested from the maintenance department an air cleaner owned by Fairfield Public Schools and did not select the unit that was ultimately placed in plaintiff's room); Doc. #82-30 (Jackson Aff.) ¶ 10 (Jackson had no involvement in selecting materials for plaintiff's art room accommodations, and plaintiff's requests were funneled to human resources and/or maintenance for resolution); Doc. #82-36 (Morabito Aff.) ¶¶ 5–6, 8 (Morabito's only involvement in accommodations for plaintiff was a single visit to the art room to inspect the furniture arrangement); Doc. #82-37 ¶ 104, 106; Doc. #87 ¶ 104, 106.

Nor is there evidence of intent to injure or create danger in the performance of the skylight repairs when plaintiff returned from her medical leave in January 2008. *See* Doc. #82-29 (Cullen Aff.) ¶ 13 (Cullen believed plaintiff was still on leave and authorized the work, but did not craft the proposal or supervise the project); Doc. #82-30 (Jackson Aff.) ¶¶ 7–9 (Jackson informed plaintiff before her return that the work was not yet completed, received assurance from maintenance after work had begun that the only nuisance would be noise, and—once informed that dust particles had fallen from the ceiling—immediately told plaintiff to take the rest of the day off); Doc. #82-36 (Morabito Aff.) ¶ 7 (Morabito spoke with an outside contractor, who performed the work); Doc. #82-37 ¶¶ 105, 107; Doc. #87 ¶¶ 105, 107.[14] Accordingly, I will therefore grant summary judgment to defendants as to Count Seven.

---

[14] There is no evidence in the record or in common sense that Clark or Boyle, the district's superintendent and deputy superintendent, had any involvement in the complained-of maintenance and supply issues.

### CONCLUSION

Defendants' motion for summary judgment (Doc. #82) is granted in full. Judgment shall enter in favor of defendants on all claims, and the Clerk is instructed to close this case.

It is so ordered.

Dated at Bridgeport this 29th day of May 2015.


/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge